Horace KERSEY

v.

**AMERICAN RIVER
TRANSPORTATION COMPANY**

No. CIV.A.03–0789.

United States District Court,
E.D. Louisiana.

June 4, 2004.

Peter Joseph Butler, Peter J. Butler, Jr., Breazeale, Sachse & Wilson LL & E Tower, New Orleans, LA, Les Anthony Martin, Law Office of Les A. Martin, Gretna, LA, for Horace Kersey, plaintiff.

Georges M. Legrand, Clarence William Emory, Mouledoux, Bland, Legrand & Brackett, LLC, New Orleans, LA, for American River Transportation Company, defendant.

### *REASONS FOR JUDGMENT*

LEMMON, District Judge.

Plaintiff Horace Kersey, a seaman, has sued defendant American River Transportation Company (Artco), his employer, for a back injury he alleges he sustained on January 29, 2003 while working aboard Artco's vessel M/V SPARTAN. The parties agreed to bifurcate liability and damages for the non-jury trial. Kersey alleges that he is entitled to recover under the Jones Act, based on the negligence of a fellow crew member and on the negligence of the employer in hiring an incompetent crewmember; under general maritime law for the unseaworthiness of the SPARTAN based on an inadequate crew; and under general maritime law for maintenance and cure.

### A. Evidence submitted.

#### 1. Testimony of Horace Kersey.[1]

#### a. Background.

Kersey, who is 27 years old, testified that he left school in the ninth grade to begin working, and was hired by Artco in April 2000. Kersey began work as a new hire, and advanced to the positions of experienced deckhand 2, leadman, and fleetmate.[2] Kersey's performance evaluations were good to excellent.[3] During his employment at Artco, Kersey worked on the vessels M/V SPARTAN and M/V HARVEST BOUNTY.

One of the daily tasks Kersey performed as a fleetmate involved manipulating and moving shorewire, a thick, heavy wire or cable made of steel. Shorewire is generally over an inch round, and 35 to 150 feet in length. Shorewire, as the name indicates, is used to moor barges to the shore; the end of the shorewire forms an eye, which attaches to a bit on the barge. Attached by a cable to the end of the shorewire is a tag buoy, which floats on the water and allows the shorewire to be grabbed from the deck of a vessel with a hook. Generally two shorewires are attached to a barge, and up to seven additional barges can be attached to the barge that is connected to the shore.

Kersey testified that lifting shorewires was "by far" the most physically demanding part of his job. Kersey indicated that he had reviewed Exhibit P–22/T–1, an Artco document entitled "Picking Up Shorewires." This document states that Artco employees are never to attempt to pick up shorewires alone, and directs them always to make sure they have enough manpower. Additionally, Kersey testified at trial that he "was instructed by Artco captains that there was [to be] three men to pull on shorewires at all times."

Kersey testified that in January 2003 he was working from 4:30 a.m. to 4:30 p.m. for five days and nights, followed by five

---

1. In addition to Kersey's trial testimony, his deposition was introduced as Exhibit P–28/T–1.

2. Exhibit D–30/T–2 (P–21/T–1) provides Artco's job descriptions for these positions.

3. Exhibits P–2/T–1; D–13/T–2.

off days. Kersey was assigned to the SPARTAN, a four-deck, 70' long vessel. The crew of the SPARTAN consisted of Captain Jason Steele; Fleetmate Kersey; Leadman Jermaine Robertson; and Deckhand William "Nicky" Alford, Jr. Kersey supervised Alford, Jr. and Robertson. Alford, Jr. was the son of William Alford, Sr., the Captain of Artco's lead vessel, and had been a member of the SPARTAN's crew for about four months. Kersey testified that Alford, Jr. was both slow and physically weak, and was not capable of performing his job. Kersey testified that although he tried his best to teach the job to him, Alford, Jr. was not interested in learning, and was more concerned about being reassigned to a line boat to become a cook. Kersey did not feel he had adequate manpower when Alford, Jr. was in his crew.

Kersey testified that he complained about Alford, Jr. to both Personnel Assistant Ken Schule and Captain Jason Steele. Kersey first went to Schule, a trusted personal friend, and told him that he felt that Alford, Jr. was a "danger to himself and to others," was too slow, and was not strong enough to do the job. Kersey also complained that Alford, Jr. "played around a lot." Kersey testified that Schule told him that Alford, Jr. would be moved to a line boat by April 1, 2003, and that Kersey should just "deal with him" until then.

Kersey testified that he later told Captain Steele that Alford, Jr. was physically and mentally slow, and was not catching on quickly; Kersey had to explain things to Alford, Jr. more than ten times for him to get it right. Kersey told Captain Steele that Alford, Jr. was not competent to do the work assigned to him, and Kersey felt that he was in danger. According to Kersey, Captain Steele brushed him off.

Kersey testified concerning a meeting on board the HARVEST BOUNTY with Alford, Sr., Alford, Jr., and Captain Steele. Alford, Sr. "basically threatened" him, telling him that he would lose his job if he did anything "against" Alford, Jr. After the meeting on the HARVEST BOUNTY, Kersey informed Schule that he felt threatened, and wanted to know when Alford, Jr. would be moved. Schule reiterated that Alford, Jr. would be moved to a line boat by April 1, 2003. Schule told Kersey that if he wanted to pursue matters further, he could; but if he did, there was "no telling what could happen."

Kersey testified that Alford, Jr.'s performance did not improve after the meeting on the HARVEST BOUNTY, but Kersey did not reprimand him any more. Kersey objected when Artco made the decision to promote Alford, Jr.

### b. Events of January 29, 2003.

Kersey testified that on January 29, 2003, he worked with several different tiers of shorewires.[4] At approximately 3:00 p.m., Kersey, Robertson, and Alford, Jr. were working with shorewire at the Tulane Fleet on the East Bank of the river. Kersey and Robertson took hold of the shorewire while in a kneeling position, while Alford Jr. proceeded to move the tag buoy out of the way. Kersey testified that it should take "a couple of seconds" to move a tag buoy, but Alford, Jr. "was taking a little longer than a usual person would." Although Alford, Jr. should have quickly moved the tag buoy and moved to help Kersey and Robertson with the shorewire, he did not do so. Kersey did not tell Alford, Jr. to move more quickly because he feared that if he were to "fuss at him," he could lose his job or "something worse could happen."

---

**4.** Kersey estimated at his deposition that he worked with "six or seven different tiers of shorewires" at two different locations prior to 3:00 p.m. Exhibit P–28/T–1 at 121.

Kersey testified that it was unsafe to remain in the kneeling position very long while holding a shorewire, because someone could get entangled or "lose body parts." It was therefore his choice, for safety reasons, to stand to get more leverage. When he stood up, he felt a "slight pull" in his back, and immediately began experiencing a slight pain.[5] Kersey believed he had a muscle pull, but did not tell anyone of the pain he experienced because he hoped it would resolve. There had been instances where he had muscle pulls that simply went away after a few hours or a few days. Kersey also testified that when he had previously suffered a hernia injury while working for Artco, he had delayed reporting the hernia for a few days and was not reprimanded for waiting.[6]

Clearly, Artco's policy required the immediate reporting of any injuries, and on April 7, 2000, Kersey had signed an Artco memorandum stating that "Please keep in mind all injuries, no matter how slight, should be reported to your supervisor. If you do not report the injury, we will assume the injury did not happen onboard the boat."[7] Additionally, Artco's "Safety Rules" required Kersey to "Report all injuries immediately."[8] Kersey acknowledged at trial that he was familiar with these safety rules during his employment at Artco.

Kersey testified that he awakened at approximately 2:00 to 2:30 a.m. on the morning of January 30, 2003 in excruciating pain. Kersey took pain medication and returned to bed. At approximately 10:00 a.m., Kersey called Schule to report that he would not be coming in to work, and would be going to the doctor because of back pain. Kersey testified that there was no discussion about how he had injured his back.

Kersey testified that he went to see Dr. Brandi Jones, his personal physician, on January 30, 2003, and told Dr. Jones that he had awakened in severe pain. Kersey did not recall using the term "accident" to her, but reported that the last thing he did on January 29, 2003 was to pull and lift heavy shore wires. Kersey did not recall using the term "accident" to her. Dr. Jones advised him to restrict his duties to light work.

Kersey testified that he spoke to Schule again after leaving Dr. Jones' office, but did not remember whether Schule asked him if he had injured himself at work or at home. At his deposition he admitted that he told Schule that he did not know whether he injured himself at work. At trial, Kersey said that this statement was in response to Schule's questions, which required him to pinpoint "a specific shorewire, a specific time, and a specific place." Kersey told him he could not do so.

In a followup meeting Kersey and Schule had in the days following January 29, 2003, Schule gave Kersey an Artco "Weekly Indemnity—Initial Form" for Kersey and his physician to complete.[9] Kersey testified that Schule told him that he would have to answer "No" to the question of whether the claim resulted from a work related illness or injury because he could not pinpoint the precise time, place, and shorewire on which he was injured.

5. At his deposition, Kersey testified that he did not recall whether Alford, Jr. was helping pull in the shorewire at the time Kersey felt the pull in his back. Exhibit P–28/T–1 at 208.

6. Kersey testified that he had settled the hernia claim for $6,500.00 because he asked for advice from Schule, who told him he thought he should just "shut [his] mouth and take it."

7. Exhibit D–1/T–2.

8. Exhibit D–2/T–2.

9. Exhibit P–6/T–1.

Kersey stated on the form that he did not know where the accident occurred.

Dr. Jones gave Kersey a prescription for physical therapy. On February 7, 2003, Kersey attended a physical therapy session with Karen Ash and completed a "Medical History/Subjective Information" form.[10] Kersey responded "don't know" to the question of how the injury occurred because Schule had told him that his injury was not work related if he could not identify the precise time, place, and shorewire on which he was injured.

On or about February 19, 2003, Kersey received a letter from Cigna HealthCare denying his request for disability benefits.[11] This letter stated that his request was denied "because your physician stated that your disability is work-related and your plan does not cover occupational claims." Kersey met with Schule, who explained that the claim was turned down because Dr. Jones had indicated on the form that Kersey's injury arose out of his employment. Schule gave Kersey a duplicate form, and told him that if Dr. Jones would redo her portion to indicate the injury was not work related, the form could be resubmitted. Kersey testified that he never gave this form to Dr. Jones because he knew he had been injured at work, and did not think it would be proper to try to have her indicate his injury was not work related.

On February 26, 2003, Kersey went to Jefferson Orthopedic Clinic for treatment, and filled out an initial patient form.[12] Kersey intentionally left blank all questions about the manner in which he was injured, because he was "confused and just didn't know what to put."

Kersey attempted to work from February 12 to 16, 2003, but could not perform his duties because of his back pain. He reports constant pain in his back since the injury. Artco has not paid any of his medical bills, nor has it provided maintenance and cure.

### 2. Testimony of Kristian Kersey.

Kristian Kersey, Horace's wife of five years, testified that Horace would often complain that Alford, Jr. was weak, childish, unfocused, and more concerned with playing than doing his job. Horace told her of a meeting at which Alford, Sr. informed him he could lose his job if he did not leave Alford, Jr. alone. When Horace complained to Schule about Alford, Jr., Schule told him he would have to work with Alford, Jr. until he would be moved to a line boat in April. Kristian testified that Horace was a very strong worker, and loved his job; he eventually wanted to become a vessel captain.

Kristian testified that on January 29, 2003, Horace came home after work and told her he had been lifting shorewires at work, and that his back was bothering him. Horace went to bed, but woke up at about 2:00 to 2:30 a.m. crying in pain.

Kristian testified that on January 30, 2003, she overheard a conversation between Horace and Schule. She heard only Horace's side of the conversation, and remembered he told Schule that his back was hurting, and he had been in pain since he lifted shorewires, but that he could not pinpoint the precise time that it occurred.

Kristian testified that she helped Horace complete the "Weekly Indemnity—Initial Form," and that Horace told her that Schule had informed him not to indicate he had been injured at work because he could not pinpoint the exact shorewire on which he was injured and the exact time his injury occurred.

---

10. Exhibit P–7/T–1.

11. Exhibit P–8/T–1.

12. Exhibit P–11/T–1.

Kristian recalled that when Horace received the denial letter from Cigna Health-Care, they were very concerned because the stated the reason for denial was that his injury was work related. Kristian testified that she and Horace met with Schule, who told them that because Horace could not pinpoint exact time and shorewire, his injury was not work related. Kristian verified that Schule had provided them with a blank form for Dr. Jones to resubmit, but the Kerseys never provided it to Dr. Jones because she had already correctly indicated the injury was work related.

Kristian testified that she told a Magnetic Resonance Imaging (MRI) technician that Horace had been injured on the river while pulling shorewire.[13] Kristian also testified that she accompanied Horace to Jefferson Orthopaedic Clinic, and that although they knew his injury was work related, he did not say so because of Schule's advice.

Kristian testified that while Horace had assisted a family member in moving furniture in January 2003, he did not injure his back while doing so, and never complained of back pain before his injury of January 29, 2003.

Kristian testified that Artco has made no attempt to pay any benefits, and denies ever receiving a disability check. She testified that Horace retained counsel on March 12, 2003.[14]

### 3. Testimony of Jermaine Robertson.

Jermaine Robertson worked as a crewman aboard the SPARTAN with Kersey at the time of the alleged injury. Robertson testified that he was never trained to handle shorewire or was instructed that three men had to handle shorewires at all times, although he agreed that the safest way to pull a shorewire is to have three men do so.

Robertson testified that Kersey trained him to be a deckhand. He recalled that Kersey was a good coworker, and that he never observed Kersey do anything unsafe. Robertson testified that Alford, Jr. was not a good worker, and was "not particularly" able to handle shorewires due to his lack of interest and strength. Robertson tried to train him, but failed because Alford, Jr. did not want to learn to become a better deckhand. Robertson believed "it was unsafe for him [Alford, Jr.] to be out there." Robertson specifically believed he and Kersey were shorthanded when working with shorewires. Robertson testified that when Alford, Jr. would move a tag buoy out of the way, this procedure should take seconds, but Alford, Jr. would take "a minute or two, or more," depending on his attitude. There were also occasions on which Alford, Jr. would move the tag line and not come back to help reel in the remainder of the shorewire. Robertson voiced concerns about Alford, Jr. to Kersey, his immediate supervisor, and Kersey told him that Schule had informed him that Alford, Jr. would not be on the SPARTAN much longer. Robertson never told anyone other than Kersey of his concerns about Alford, Jr.

Robertson believed that Alford, Jr. was shown favoritism because his father was an Artco captain. Robertson was fired over an incident involving him and Alford, Jr. in which fuel oil was allowed to leak into the vessel's bilge, and believes he "took the fall" for Alford, Jr.[15]

---

13. The document from MRI of Louisiana evidencing this test indicates that "Patient injured back pulling on cable." Exhibit P–10/T–1.

14. Exhibit D–24/T–2.

15. Robertson is currently pursuing a claim against Artco arising out of his termination.

Robertson recalled the meeting between Horace, Alford, Sr., Alford, Jr., and Captain Steele aboard the HARVEST BOUNTY. Robertson testified that he did not attend this meeting, but Kersey told him that he had been threatened over his treatment of Alford, Jr., and had been told to leave Alford, Jr. alone. After this meeting, neither Kersey nor Robertson made any further efforts to correct Alford, Jr.'s actions.

Robertson testified that he did not witness any incident involving Kersey on January 29, 2003, and that Kersey did not mention any injury to him on that day.

### 4. Testimony of Kenneth Schule.

Kenneth Schule testified that he is an Artco Personnel Assistant who handles employee payroll, vacation requests, terminations, etc. Schule had a "better than average" relationship with Kersey, and recalled talking to Kersey many times about both business and personal matters. Schule testified that Artco's policy is that all accidents and injuries must be reported immediately, and that the accident report signed must be signed by the employee and his supervisor.

Schule testified that on January 30, 2003, Kersey called to tell him he could not come into work that day because he had awakened at 2:30 a.m. with a sharp pain in his back. He denied Kersey's telling him anything about an injury at work. Kersey told Schule that he would be seeing his personal doctor that day. This was significant to Schule because he believed that if Kersey had been injured at work he would not have seen his own physician, but would have asked for medical treatment provided by the company.

Schule testified that he provided Kersey with the Artco Weekly Indemnity—Initial Form for non-occupational injuries. Kersey and Dr. Jones had completed the form and Kersey returned the form to Schule, who filled out the employer's statement and sent it into company. Schule did not read the section that Dr. Jones filled out.

After Kersey was rejected by Cigna for disability benefits, Schule gave Kersey a blank Weekly Indemnity—Initial Form and instructed Kersey to ask Dr. Jones to indicate his injury was not work related. Schule testified that for six weeks Kersey indicated he did not know how he had been injured, and never asked to fill out an accident report indicating the injury occurred at work.

Schule testified that the first time he became aware that Kersey was claiming his injury of January 30, 2003 was work related was a letter from Kersey's attorney in mid March. Schule also recalled that Captain Jason Steele told him that Kersey might have been hurt moving furniture at home.

Schule testified that although Kersey had complained about Alford, Jr., he had not complained about his strength or ability to pull on shorewires. According to Schule, Kersey said Alford, Jr. "was slow," and didn't retain information as well as the average deckhand. Schule did not arrange for Alford, Jr. to receive additional training because some deckhands simply catch on slower than others.

### 5. Testimony of Captain Jason Steele.

Captain Jason Steele began working for Artco in 1988 as a new hire, and progressed through the ranks to Captain. Captain Steele testified that he had a good relationship with Kersey, who was a fine worker. Captain Steele was not aware of any problems experienced by Kersey on January 29, 2003. He testified that Kersey did not report having any problem with shorewires, nor did he report that he was experiencing any back pain. Had Kersey complained of a work injury on January 29,

2003, Captain Steele would have filled out an accident report. Captain Steele testified that had Kersey asked for any additional manpower that day, Captain Steele would have procured additional assistance.

Although Captain Steele testified at his deposition that Kersey called him at 3:00 a.m. on the morning of January 30, 2003 and told him he injured his back, at trial he indicated this was not accurate.

On January 31, 2003, between 4:30 a.m. to 4:40 a.m. Kersey reported to Captain Steele that his back was hurting and that he was taking medication. Captain Steele told Kersey that he could not work while medicated. According to Captain Steele, Kersey did not report an on-the-job injury.

Captain Steele testified that he worked with Kersey for five days in February 2003. Kersey still did not report that he had hurt his back while pulling shorewires at work. Captain Steele recalled that Kersey told him that he moved his brother and sister into his house during January 2003.

Captain Steele testified that he and Alford, Sr. are good friends. Steele recalled going with Kersey to a meeting with Alford, Sr. and Alford, Jr. on the HARVEST BOUNTY. Captain Steele testified that Alford, Sr., Artco's leading captain, had previously asked him if he was aware of any horseplay between Kersey and Alford, Jr., and the issue of horseplay was addressed at the meeting on the HARVEST BOUNTY. Captain Steele did not recall Alford, Sr.'s telling Kersey to leave Alford, Jr. alone, or to stop complaining about Alford, Jr.'s lack of strength.

Captain Steele testified that he had served on the same vessel with Alford, Jr., and found him to be a "fairly good" deckhand who would do what needed to be done. He testified that Kersey had complained to him that Alford, Jr. was "weak,"

but never indicated that Alford, Jr. was incompetent to be a deckhand. Captain Steele was never told that Alford, Jr. had received an evaluation on November 18, 2002, which had given him a "2" rating on tow work.[16] If he had been made aware of this rating, he would have arranged for Alford, Jr. to receive additional training.

Captain Steele indicated that on February 5, 2003, Robertson and Alford, Jr. were involved in an incident in which fuel from the SPARTAN was allowed to leak into the bilge. Captain Steele issued disciplinary reports to both men in connection with this incident. On Robertson's disciplinary report, he indicated that Robertson had given engine room responsibility to Alford, Jr., a "green deckhand."[17] Captain Steele explained that this term referred to lack of experience as to the engine room, not in Alford, Jr.'s other abilities.

Captain Steele identified Exhibit D–31/T–2, which addressed procedures for "Picking Up Shorewires." He also recalled that Artco's policy since 2001 is for three men to handle shorewires at all times, but that there is nothing in writing reflecting this policy. No formal instructions have been given that three men have to handle shorewires at all times.

### 6. Testimony of William Alford, Jr.

William Alford, Jr. testified that he was 22 years old and had graduated from high school in 2001. Alford, Jr. wrestled and played on the junior varsity football team in high school and continues to work out, bench pressing up to 245 pounds. He has no physical problems.

Alford, Jr. testified that he first began working for Artco a year and a half before trial, and wanted to be a cook. He first

16. Exhibit D–26/T–2.

17. Exhibit D–27/T–2.

worked as a laborer at an Artco shipyard, bringing equipment to the barges and carrying things around the yard. When he applied for work as a deckhand, he passed a preemployment physical.[18]

When Alford, Jr. began working on the SPARTAN, Captain David Hoyt was in charge of the vessel. Captain Hoyt evaluated him on November 18, 2002,[19] told him he was doing a great job, and promoted him as a result of the evaluation.

Alford, Jr. recalled that as a deckhand he pulled shorewires four or five times a day. Alford, Jr. testified that he never had any problems pulling shorewires, and that no one ever told him he was too weak to do so. Alford, Jr. testified that pulling shorewires was "usually" a three man job, but could be done by two.

Alford, Jr. testified that he sometimes had problems with Kersey at work when they "horsed around." He told his father about these problems, and recalls a meeting between him, Kersey, Alford, Sr., Captain Steele, and Robertson at which Alford, Sr. informed them that horseplay is not appropriate and must cease. He does not recall Alford, Sr. threatening Kersey at this meeting.

Alford, Jr. did not recall any accident or other problem involving Kersey as they worked together on January 29, 2003.

### 7. Testimony of Dr. Rakesh Patel.

Dr. Rakesh Patel testified by deposition that he is board certified in internal medicine and pediatrics. In September 2002, Dr. Patel worked for Concentra Medical Center, and 80 to 90% of his practice involved evaluating individuals for different types of employment and doing preemployment examinations to determine fitness for certain jobs. On September 18, 2002, Dr. Patel performed a pre-placement physician examination of William Alford, Jr. for Artco when he applied for the position of deckhand. Based on Dr. Patel's ten to fifteen minute examination, as well as a Human Performance Evaluation given to Alford, Jr., his "opinion was that he [Alford, Jr.] was able to perform essential functions, and as far as I could tell, there were no restrictions medically."[20] Dr. Patel believed that Alford, Jr. was medically and physically qualified to do the work of a deckhand.[21] Dr. Patel testified that doctors "are given for each type of job a different set of skills that the potential employees will be performing, and we review those, and in general, when we do these evaluations, our evaluations are geared toward determining whether the patient can do those functions."[22]

### 8. Testimony of William Alford, Sr.

Captain William Alford, Sr. testified that he has been a vessel captain for about 20 years, and has worked as a captain for Artco for about 12 years. Captain Alford has known Kersey for two or three years, and testified that Kersey was a deckhand under him. Captain Alford thought he had a good relationship with Kersey, who was an excellent worker, and would have no problem working with Kersey if Kersey were physically able. Captain Alford testi-

---

**18.** The record reflects that Alford, Jr. underwent two preemployment physicals, one in connection with his employment by Artco as a laborer and one in connection with his employment as a deckhand. He passed both physicals.

**19.** Exhibit D–26/T–2 is Alford, Jr.'s personnel file, which contains this evaluation.

**20.** Depo. Dr. Rakesh Patel, January 5, 2004, at 19 (Exhibit D–50/T–2).

**21.** Exhibit D–50/T–2 at 21.

**22.** Exhibit D–50/T–2 at 56.

fied that he does not know anything about Kersey's accident.

Captain Alford testified that his son, Alford, Jr., had once complained to him about horseplay between him and Kersey. Because Artco rules prohibit horseplay, Captain Alford convened a meeting on the HARVEST BOUNTY with Alford, Jr., Kersey, and Captain Steele. He called the meeting just to stop the horseplay "to protect everybody's job." Captain Alford testified that he never threatened Kersey at this meeting, but made clear that if the horseplay did not stop, he could be written up or let go. Although Captain Alford also had a problem with Kersey verbally abusing Alford, Jr., he could not recall at trial if he addressed that issue at the meeting on the HARVEST BOUNTY.

Captain Alford testified that his son was a "green" deckhand when he was hired, meaning that he was "new to the industry." Captain Alford has heard other Artco employees complaining about his son, and had heard his son "had things to learn." With regard to Alford, Jr.'s evaluations, he indicated that a "2" is not necessarily bad, but means someone should get additional on the job training.

Captain Alford testified that he has never heard of the policy which requires three men to handle shorewires. He indicated that a tag line can take thirty seconds to two to three minutes to be moved.

### 9. Testimony of Captain David Hoyt.

Captain David Hoyt evaluated Alford, Jr. on November 18, 2002. He characterized this evaluation as generally good, and denied that he was pressured to give Alford, Jr. a good evaluation because his father was an Artco captain. Captain Hoyt testified that Kersey was aware of the evaluation, and raised no objections to it. Captain Hoyt denies being told that Alford, Jr. did not have sufficient strength to handle shorewires.

Captain Hoyt testified that Kersey was an excellent and safe worker. Robertson was a good worker, and was "sometimes" a safe worker. Captain Hoyt testified that a "green" deckhand is someone on river for the first time, or someone who has made a mistake. He did not consider Alford, Jr. to be "green." Captain Hoyt testified that "[i]t's a safe practice" to have three men on a shorewire, although he was not aware that this was an Artco policy.

### 10. Testimony of Dr. Kenneth Adatto.[23]

Dr. Kenneth Adatto, who was accepted by the court as an expert in the field of orthopaedic surgery, testified that he first saw Kersey on March 25, 2003.[24] Kersey gave a history of having a lifting injury at work. Dr. Adatto testified that Kersey's February 21, 2003 MRI showed a ruptured disc at two levels, L-4/L-5 and L-5/S-1.

Dr. Adatto testified that Kersey was totally disabled from his job as a deckhand due to his injury.[25] Based on the history provided by Kersey, Dr. Adatto opined that Kersey's ruptured discs were caused by an injury he sustained on January 29, 2003.

Dr. Adatto testified that 90% of the patients he treats for a disc herniation remember a causative event, and that he must rely on a patient's history in determining the existence of such an event. He

---

**23.** In addition to Dr. Adatto's trial testimony, his deposition was submitted into evidence as Exhibit P–33/T–9.

**24.** Dr. Adatto's medical records are Exhibit P–27/T–1.

**25.** At his deposition, Dr. Adatto indicated that Kersey was disabled regardless of whether his later fusion was successful. Kersey's surgery could only lessen his pain, not give him any additional work capacity.

further testified that 80% of disc herniations for people in Kersey's age range are caused by trauma, and 20% have discs that are abnormal but not symptomatic. Even if Kersey's back fell within the 20% that are abnormal, it became symptomatic due to his accident. Dr. Adatto could not say whether Kersey's MRI showed a preexisting condition, but testified at his deposition that the MRI was consistent with a trauma on January 29, 2003:

> Q: In your opinion, would the changes shown on that MRI have predated January 29th?
>
> A: You can't say that for sure. I mean, it could or it could not. It takes four to six weeks to show up, so basically it could have been caused before January or afterwards. We don't know, because that's in the area where a traumatic injury can cause a ruptured disc to look like that. So looking at the MRI alone, I can't tell you whether it was caused that exact date or before that.
>
> 20 percent of the normal population will have an abnormal MRI with no pain. So eight chances out of ten, in this age range it's caused by trauma, and certainly the trauma that he had and the date he had it could cause the MRI to look just like this. So it could be traumatically induced by the history.[26]

Dr. Adatto testified that he reviewed Dr. Steiner's December 18, 2003 report, and that both agree that Kersey suffered a disc herniation. Dr. Adatto did not agree with Dr. Steiner's opinion that the herniation was preexisting, and stated that it appeared to him that Dr. Steiner simply did not believe Kersey's history of having sustained a trauma to his back on January 29, 2003. Dr. Adatto did not believe that decreased signal intensity on Kersey's MRI

meant that his condition was longstanding. Dr. Adatto indicated that it is "academic" whether the disc was already injured, because whether it was injured on January 29, 2003 or whether the work Kersey performed on that date caused it to become symptomatic, it was clearly asymptomatic prior to that date.

**11. Testimony of Dr. Robert Steiner.**

Dr. Robert Steiner was accepted by the court as an expert in the field of orthopaedic surgery. Dr. Steiner performed an independent medical examination of Kersey on May 27, 2003. Kersey told Dr. Steiner that he had injured his back while pulling on heavy shorewire; he felt a pulling sensation while doing so. Dr. Steiner's report comes to three basic conclusions: Kersey's MRI shows a degenerative condition that began well over a year before the alleged incident of January 29, 2003; there are no findings on the MRI to indicate his condition occurred in January 2003; and "it is my opinion, more probable than not, that Mr. Kersey did not injure his back while pulling on a shore line at 3:00 p.m. on 1/29/03."[27]

Dr. Steiner reviewed Kersey's lumbar MRI of February 21, 2003, which revealed decreased signal intensity at L4–L5 and L5–S1. This is evidenced by a dark color on the disc film, and is degenerative in nature. The MRI shows central disc herniations at L4–L5 and at L5–S1. In his opinion, those degenerative conditions predated January 29, 2003 because it takes six months or longer for a degenerative condition to establish itself on an MRI after trauma. Because the MRI was just three weeks after Kersey's alleged injury, it was too soon for the condition to manifest on the MRI.

---

**26.** Exhibit P38–T–9 at 29–30.

**27.** Exhibit D–20/T–2.

Dr. Steiner allowed that if Kersey had a preexisting condition, pulling on shorewires on January 29, 2003 could have aggravated his condition and led to the symptoms which Kersey experienced.

### 12. Testimony of Dr. Brandi Jones.

Dr. Brandi Jones testified by deposition that she is Board Certified in Internal Medicine and Pediatrics. Dr. Jones saw Kersey on January 30, 2003 at the Family Physicians' Center.[28] Dr. Jones wrote in her notes of that visit that Kersey reported "no trauma:"

> At that visit, I documented no trauma, and in that, I would like to explain, that I was limiting my definition of no trauma specifically to exclude motor vehicular accident, injury inflicted by another person or a fall.
>
> I then go to document in my note that he works as a deckhand with strenuous, heavy lifting, and it is in that documentation that I meant to establish his report of lifting heavy shore line on 1–29 of 2003, which then was associated with his acute onset of back pain in the middle of the night.[29]

Dr. Jones testified that Kersey only told her he had lifted heavy shore line on January 29, 2003, and did not report that he had experienced a muscle pull or other pain while lifting the wire.[30] Dr. Jones diagnosed a possible muscle strain or spasm, and recommended that Kersey perform only light duty work.

Dr. Jones saw Kersey again on February 5, 2003, and noted in her records that he was still experiencing intermittent pain. Dr. Jones diagnosed a muscle strain or spasm, and ordered x-rays of his thoracic and lumbar spine. She also referred him to physical therapy. Because the pain was persisting, Dr. Jones began to suspect Kersey's problem was disc related.[31]

Kersey returned for a final evaluation by Dr. Jones on February 20, 2003. Although his x-rays were negative, he continued to experience pain, and could not work. Dr. Jones diagnosed him with a persistent lumbar strain, and referred him for a MRI test. The MRI showed:

> That he had a posterior midline disc protrusion, broad-based bulge at L4 to L5 with nerve root crowding. They were not able to exclude neural impingement and he had the same findings, similar, but to a lesser extent at L5 to S1, and at that time I referred him to orthopedics for further evaluation and treatment recommendations.[32]

Dr. Jones testified that Kersey's injury was caused by heavy lifting that occurred on January 29, 2003:

Q: What period of time could you relate [Kersey's injury] back to? You indicated you couldn't relate it back five months, but could you relate it back to a week previous?

A: That's unclear. I mean, his clinical history supports that he was able to function at 100 percent capacity up until January 29th.

Q: Well, I thought you have indicated on January 29th he was fine?

A: He was fine.

Q: Right.

A: Up to and including January 29th.

Q: Right.

A: He developed acute onset of back pain on January 30th. I cannot comment on a hypothetical situation that

28. Dr. Jones' records are Exhibit P–5/T–1.

29. Depo. Dr. Brandi K. Jones, November 21, 2003, at 13–14 (Exhibit P–31/T–7).

30. Exhibit P–31/T–7 at 21–22.

31. Exhibit P–31/T–7 at 54.

32. Exhibit P–31/T–7 at 59.

the patient didn't clinically report to me.

In my medical opinion, it is more probable that it is associated with this heavy lifting that occurred on January 29th, based on his clinical history on the 30th.[33]

On May 19, 2003, in response to a request for clarification by Kersey's counsel, Dr. Jones wrote a letter "To Whom It May Concern" stating:

Mr. Horace Kersey initially presented to the Family Physicians Center on January 20, 2003. On the day of presentation, he awoke with lumbar back pain and spasm. On the evening prior, he was lifting heavy shore wire at work. At his initial presentation, it was documented "no trauma." However, the next clause in that note states the following: "works as deck hand with heavy strenuous lifting." In clarification, no trauma in this incident refers only to the lack of a motor vehicle accident, a fall, or an injury inflicted by someone precipitating the clinical condition. It does not eliminate the causality between this heavy work activity and his new onset back pain on presentation. Throughout this patient's clinical diagnosis, treatment, and referrals, documentation consistently reflects that this patient performs strenuous work and heavy lifting as a deck hand. It is further documented that the clinical condition is likely caused and/or aggravated by his strenuous work as a deck hand.[34]

### 13. Testimony of Sara Katz

Sara Katz testified by deposition that in February 2003, she was employed as a physical therapist at West Jefferson Medical Center. She first met with Kersey on February 7, 2003. At that time he filled

out a "Medical History/Subjective Information" form. Under "First episode," Kersey responded "1–30–03;" and under "Second episode," he put "1–31–03." In response to the question of "How the injury or problem occur[red]," Kersey wrote "Don't Know." Katz also filled out a "Lower Spine INITIAL EVALUATION" form, indicating under the past medical history section that "Pt does not know how he hurt his back, but it started hurting in the morning." Additionally, under the heading "Mechanism of injury," Katz indicated "UNK" (meaning unknown), "but possibly lifting." Katz testified that this information was based on her interview with Kersey. Katz did not recall if she specifically asked him whether his injury resulted from work.

After the meeting of February 7, 2003, Katz prepared a course of physical therapy, which Dr. Jones approved. Katz evaluated Kersey's progress again on February 12, 2003, and Kersey seemed to be improving. On March 3, 2003, Katz noted that Kersey had a "reinjury," by which she meant either a "[r]einjury or exacerbation of symptoms."[35] Because Kersey's pain had gotten worse, Katz modified his physical therapy regimen. Although Kersey's prescription for physical therapy allowed him to attend 23 additional sessions, he did not return.

### B. Analysis.

Kersey has sued Artco under the Jones Act, 46 U.S.C.App. § 688, based on the negligence of a fellow crew member and on the negligence of the employer in hiring an incompetent crewmember; and under general maritime law for the unseaworthiness of the SPARTAN based on an inadequate crew, and for maintenance and cure.

---

**33.** Exhibit P–31/T–7 at 76–77.

**34.** Exhibit P–5/T–1.

**35.** Depo. Sara Katz, October 15, 2003, at 74–75 (Exhibit D–48/T–2).

### 1. Liability for negligence under the Jones Act.

■ Under the Jones Act, Kersey is entitled to recover "if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir.1997) (*en banc*). The duty of care owed by Artco to a seaman such as Kersey is that of ordinary prudence under the circumstances. *Id.* at 338. The mere fact of an injury, without negligence, does not give rise to liability:

> [T]he mere fact that an injury has occurred does not trigger liability under the Jones Act. An injured seaman must produce evidence that the shipowner, his employees, or agents were negligent. Negligence is the failure to use ordinary care under the circumstances; the doing of some act that a reasonably prudent person would not do; or the failure to do something that a reasonably prudent person would do under the same or similar circumstances. This negligence standard also its hand-in-glove with the employer's basic duty under the Jones Act—to exercise reasonable care to provide the seamen with a safe place to work.

> \* \* \* \* \* \*

> A shipowner is liable for negligent failure to select a competent master and crew. Thus the employer is vicariously liable for the negligence of its employees or agents.

Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6–22, at 348 (4th ed.2004). Kersey contends (1) that Artco is liable because of its negligence in hiring Alford, Jr. and in allowing him to continue working even after being notified that he was incompetent, and (2) that Artco is liable because of the negligence of its employee, Alford, Jr., in not properly assisting Kersey in handling shorewire.

■ The evidence does not establish that Artco acted negligently in hiring Alford, Jr. or in failing to replace him in the crew of the HARVEST BOUNTY. Alford, Jr. passed both of his preemployment physicals, had participated at school in athletic activities, was able to press 245 pounds, and subsequent evaluations indicate that he was able to handle the job. Alford, Jr. was expected to learn part of his duties on the job, and fellow employees such as Kersey were to assist him. Captain Steele testified that Alford, Jr. was an adequate worker. His performance evaluations were satisfactory and he received periodic promotions. The evidence does not establish that Artco acted negligently either in hiring him or in failing to replace him as a member of the crew of the vessel.

Additionally, the evidence does not support a finding that Alford, Jr. failed to use ordinary care or act as a reasonably prudent seaman in handling the shorewires. Other than Kersey's own subjective belief that Alford, Jr. was taking too long to move a tag buoy, there is no evidence of Alford, Jr.'s negligence.

### 2. Liability under General Maritime Law for Unseaworthiness.

■■ A Jones Act seaman "may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness." *Becker v. Tidewater, Inc.*, 335 F.3d 376, 387 (5th Cir.2003). In order to recover for the alleged unseaworthiness of the SPARTAN, Kersey must show that Artco "provided a vessel (including its appurtenances, gear and equipment) that was not reasonably fit for its intended purposes." *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir.1992). "An unfit crew can render a vessel unseaworthy. A crew's inadequacy may stem from their insufficient numbers or incompetence." *In the Matter of Bow-*

*mech Marine, Inc.,* No. 91–2409, 1992 WL 266098, at *2 (E.D.La. Sept.24, 1992), *aff'd on other grounds,* 15 F.3d 500 (5th Cir. 1994); *see also Admiralty and Maritime Law* § 6–25, at 362 ("Members of the crew of a vessel are also warranted as seaworthy, and there may be liability for crew assaults, brutality, negligent orders, or for utilizing and understaffed or ill-trained crew.").

For the reasons stated above, the evidence does not establish that Alford, Jr. was unfit to work as a member of the crew.

### 3. Maintenance and Cure.

■ In *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (5th Cir.1995), *cert. denied,* 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996), the Fifth Circuit summarized the basic premise of maintenance and cure:

> When a seaman becomes ill or injured while in the service of his ship, the shipowner must pay him maintenance and cure regardless of whether the shipowner was at fault or whether the ship was unseaworthy. "Maintenance" is the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the ship. "Cure" is the right to necessary medical services. This duty to pay maintenance and cure is of ancient vintage, and its origin is customarily traced back to the medieval sea codes. Only "seamen" can assert the right to maintenance and cure, but the legal test for seaman status in maintenance and cure actions is the same as the inquiry under the Jones Act.

*Id.* at 1499 (citations omitted). In order to recover maintenance and cure, a plaintiff bears the burden of proving that he was a seaman; that an illness or injury occurred, was aggravated, or manifested itself while in the ship's service; the wages to which he is entitled; and the expenditures in-

curred. *Lodrigue v. Delta Towing, L.L.C.,* No. 03–0363, 2003 WL 22999425, at *6 (E.D.La. Dec.19, 2003); *see also Admiralty and Maritime Law* § 6–28, at 380 (noting that to be eligible for maintenance and cure, a seaman "must be 'in the service of the ship' at the time of the illness or injury"). Ambiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman. *Liner v. J.B. Talley and Co., Inc.,* 618 F.2d 327, 332 (5th Cir.1980).

■ Artco argues that Kersey may not recover maintenance and cure because no accident occurred on January 29, 2003. The court finds that Kersey's failure to report his injury to his employer or to complete an accident report does not defeat his claim that his injury was sustained while in service of the ship. The evidence shows Kersey is an excellent employee who has made much progress with limited education. His excellent work history had him on a track to becoming a captain. The court accepts his testimony that his injury was sustained on January 29, 2003 while working with heavy shorewires. Although his only symptom while at work was a slight pulling in his back, his severe pain several hours later is consistent with his having sustained the injury as he handled heavy shore line at work. Dr. Adatto opined that Kersey's ruptured discs were caused by an injury he sustained at work on January 29, 2003, and Dr. Jones agreed that it is probable that Kersey's back pain was associated with the heavy lifting he performed on that date. Although Dr. Steiner did not believe that Kersey sustained an injury on January 29, 2003, he admitted at trial that pulling on shorewires could have aggravated a previous condition and led to the symptoms which Kersey experienced. Therefore, Kersey is entitled to maintenance and cure.

## C. Conclusions.

The evidence adduced at trial demonstrates that Artco was not negligent, and the SPARTAN was not unseaworthy. The court accordingly renders judgment in favor of Artco and against Horace Kersey on his Jones Act and unseaworthiness claims. Because the injury was sustained "while in the ship's service," the court renders judgment in favor of Horace Kersey and against Artco on his claim for maintenance and cure.